IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Heather Love Carman, | Case No. 3:13 CV 922 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS SUMMARY JUDGMENT |
| -vs- | |
| Erie County, et al., | JUDGE JACK ZOUHARY |
| Defendants. | |

**INTRODUCTION**

Over the course of four years, Plaintiff Heather Carman, an African-American attorney, applied for four different jobs with Defendants[1] -- two assistant prosecutor positions with the County Prosecutor's Office and two director positions with the County Department of Job and Family Services ("DJFS"). Not only was Carman not offered any of the four jobs, she never received an interview. Notably, Carman's former law partner, also African American, worked in the County Prosecutor's Office, and the two parted ways acrimoniously, replete with litigation and name calling.

Carman alleges Defendants did not hire her because she is African American. Defendants move for summary judgment (Docs. 53, 66 and 69), and this Court heard oral argument (8/29/14 Dkt. Entry).

---

[1] Plaintiff brings claims against Erie County, the Erie County Board of Commissioners, the Erie County Prosecutor's Office, and the Erie County Department of Job and Family Services. For ease of discussion, the Court will simply refer to them collectively as "Defendants."

**BACKGROUND**

**Education and Employment History**

Carman has been a licensed Ohio attorney since 2000 (Doc. 48, Carman Dep. 18). She earned her law degree in 1997 from the University of Dayton and, prior to that, earned a bachelor's degree in music from Ohio Wesleyan University (Carman Dep. 19). She is a resident of Erie County (Doc. 21, Am. Compl. ¶ 1).

After passing the Ohio bar, Carman worked in private practice and started her own law firm -- Goodrum & Carman, LLP -- in 2001 with Cheryl Goodrum, also an African-American female attorney (Carman Dep. 33–34). According to Carman's resume, she was a "jack of all trades" attorney, handling "aspects of juvenile, civil rights litigation, contract, probate, criminal, divorce, bankruptcy, worker's compensation and personal injury cases" (Doc. 48-2, Resume 1; Doc. 48-3, Resume 2). The partnership acrimoniously broke up in November 2003, and litigation between Carman and Goodrum ensued, including Goodrum suing Carman for slander, libel, and defamation (Doc. 49, Goodrum Dep. 35–36; Carman Dep. 41–42, 45). In the midst of the dispute, in January 2004, Goodrum became an assistant prosecutor for Erie County (Goodrum Dep. 52).

After the law firm dissolved, Carman hung out a shingle as a solo practitioner, taking the same wide variety of cases as she had during her partnership with Goodrum (*see* Resume 1, Resume 2). In 2005, Carman added to her solo practice by contracting with the Sandusky County DJFS to litigate child support enforcement issues and to establish child support orders (Carman Dep. 61–65; Resume 1; Resume 2). This relationship with Sandusky County lasted about two years until July 2007 when Carman resigned to run for a judgeship. During 2005–08, Carman also took contract work from time to time as a "Title IV-D" attorney for Huron County Child Services Enforcement Agency within

2

Huron County DJFS, performing work similar to her contract position with Sandusky County. She had previously taken such work from Huron County when she was in partnership with Goodrum in 2002 (Carman Dep. 52–53, 57–58).

In January 2009, Carman began a full-time job with Huron County DJFS as a Child Support Enforcement Agency staff attorney (Carman Dep. 72). She remains employed in this capacity today, handling paternity and child support matters. Her responsibilities are as follows: 35% devoted to reviewing referrals from child support caseworkers to determine proper legal action; 35% preparing cases for hearings; 20% monitoring compliance with standards, preparing correspondence, and assisting with public relations; 5% conducting or participating in administrative hearings concerning child support; 5% "non-essential" functions (Doc. 55 at 13). According to the Huron County DJFS 2011 organizational chart, Carman supervises two individuals -- one investigator and one secretary (Doc. 55 at 11).

### Four Applications to Erie County

Carman complains about four instances of failure to hire. Each form the basis for her claims of discrimination under state law and Section 1981 under federal law. Only the last instance -- the failure to hire her as DJFS Director in December 2011 -- forms the basis of the state and federal retaliation claims in Counts I and III.

(1)     December 2007 Assistant Prosecutor (Child Services)

Carman applied for an opening as an assistant prosecutor in the Erie County Prosecutor's Office in December 2007. The advertised job opening described the duties, among others, as follows (Doc. 48-5):

3

- Act as an attorney for the Children's Services Unit of the Erie County Department of Jobs and Family Service ("Agency"), including, but not limited to:
  - Initiation of legal proceedings on behalf of abused, neglected or dependent children in Erie County.
  - Represents the Agency at adjudicatory and dispositional hearings of Children Services cases.
  - Participates in Team Decision making and meets with families involved in Children Services.

- Act as an attorney for the Child Support Enforcement Division of the Erie County Department of Job and Family Services, including, but not limited to:
  - Establishing paternity of children born out of wedlock;
  - Securing compliance with support orders;
  - Establishing or modifying orders for support;
  - Providing any other child support Title IV-D services as required by law.

- Represent the Prosecutor's Office as a member of the Erie County Family Drug Court.

Defendants hired Isadora Almaro, an assistant prosecutor from Cuyahoga County. Carman was not interviewed for this position or sent a pre-interview questionnaire. This position would have required Carman to work with Goodrum who, at the time, was a juvenile prosecutor in Erie County (Goodrum Dep. 96–97). Goodrum had told individuals in the Prosecutor's Office that she would quit if Carman were hired (Goodrum Dep. 97). Mary Ann Barlyski, assistant chief prosecutor for the Prosecutor's Office, whose duties included assisting in hiring, interviewing, and making hiring recommendations, testified that the animosity between Goodrum and Carman was a key factor in not selecting Carman for the job (Doc. 50, Barlyski Dep. 33–34). In addition, Barlyski considered Almaro's experience to be superior to that of Carman (Barlyski Dep. 56–57).

4

(2) May 2011 Assistant Prosecutor (Criminal)

In May 2011, Carman applied for another assistant prosecutor position, this time for a criminal position. County Prosecutor Kevin Baxter ultimately decided not to fill this position because of funding concerns (Doc. 56, Baxter Aff. ¶¶ 5–6). Carman was not interviewed. Instead of filling the vacancy created by a departing assistant prosecutor, the Prosecutor's Office redistributed felony prosecutions among existing assistant prosecutors and contracted to send municipal court prosecution work to a former assistant prosecutor, Nic Smith, a white male, who was now in private practice (Baxter Aff. ¶ 6). The volume of the municipal court prosecutions amounted to part-time work (Baxter Aff. ¶ 6).

(3) April 2011 Director of DJFS

In April 2011, Carman applied to be the director of DJFS. The director oversees all four divisions of the DJFS (Workforce Development, Adult and Child Protective Services, Child Support Enforcement, and Human Services) and is effectively the CEO of the agency. By way of example, Carman's position with the Huron County DJFS was within the Child Support Enforcement division as a staff attorney.

The minimum qualifications contained in the director posting included a "Bachelor's Degree preferred in Social Work, counseling or related field," and "Seven (7) years progressively responsible experience in supervision of at least one division" (Doc. 48-7). The preferred qualifications included a "Master's Degree Social Work, Psychology or Public Administration and/or Fifteen (15) years progressively responsible experience in supervision of at least one division of Human Services" (*id.*). Among other responsibilities, the posting noted the director is responsible for developing an annual budget and administering fiscal controls (*id.*).

Defendants hired Aaron Voltz, a long-time DJFS employee who most recently had served as the assistant to the director. Voltz held a bachelor's degree in psychology and a master's degree in criminal justice (Doc. 51-12). Carman was not interviewed because the hiring committee, which included Human Resources Director Margaret Rudolph, County Administrator Mike Bixler, and County Commissioner William Monaghan, considered her unqualified (Doc. 51, Monaghan Dep. 36, 63–64).

In September 2011, Carman filed an OCRC charge against Defendants for not hiring her for the three prior positions, alleging racial discrimination.

(4) December 2011 Director of DJFS

When Voltz was terminated in July 2011 as DJFS director after he was arrested for allegedly raping an acquaintance, Defendants named Karen Balconi-Ghezzi as interim director while Defendants looked for a new director (Doc. 52, Rudolph Dep. 128–29, 136–37). Balconi-Ghezzi applied to be director, as did Carman. Balconi-Ghezzi was an 18-year employee with DJFS and most recently an administrator to one of the four divisions. Further, she was the longest-serving division head at DJFS (Rudolph Dep. 136–37; Doc. 51-17). Carman was not interviewed for the position, and Defendants hired Balconi-Ghezzi.

**SUMMARY JUDGMENT STANDARD**

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, this Court must draw all

inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, it determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

## ANALYSIS

### Count II - State Law Race Discrimination (Failure to Hire)

Ohio race discrimination claims premised on R.C. § 4112 are subject to the same analysis as Title VII claims. *See, e.g.*, *Conley v. City of Findlay*, 266 F. App'x 400, 404 (6th Cir. 2008) ("The Ohio Supreme Court has held that the analysis used to evaluate claims under § 4112.02 is identical to the analysis used for Title VII."). To recover under a disparate-treatment theory of employment discrimination, Carman must show that Defendants treated her less favorably because of her race. In a circumstantial case, such as this, this Court applies the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case of disparate treatment, a plaintiff in a failure-to-hire case must show: (1) she is a member of a protected class; (2) she applied for and was qualified for the position; (3) she was considered and denied the position; and (4) another applicant with similar qualifications who was not a member of the protected class was hired for the position. *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 879 (6th Cir. 2013).

If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for not hiring plaintiff. To overcome that proffered rationale, the burden shifts back to plaintiff to establish pretext by showing that the proffered reason (1) has no

7

basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Goodsite v. Norfolk So. Ry. Co.*, 957 F. Supp. 2d 888, 898 (N.D. Ohio 2013) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

### 2007 Assistant Prosecutor

For purposes of summary judgment for this job, this Court finds Carman has established a prima facie case. However, Carman cannot establish that the stated reasons for Defendants' decision to hire Almaro were pretextual.

The undisputed record evidence establishes there was a significant rift between Carman and Goodrum, who, as a juvenile prosecutor, would be working extensively with the successful candidate. The undisputed evidence also establishes that Goodrum (also an African-American and a member of Carman's protected class) threatened to quit if Carman was hired. Carman contends she held no animosity towards Goodrum by the time she applied for the job with the Prosecutor's Office, and if Goodrum held animosity or otherwise felt unable to work with Carman, that could not be fairly attributed to Carman in Defendants' assessment of her as a candidate. However, whether a candidate would work well with existing staff is a valid consideration, regardless of who disliked whom. *See, e g., Mischer v. Erie Metro. Housing Auth.*, 345 F. Supp. 2d 827, 830 (N.D. Ohio 2004) ("Plaintiff's contention that her assertive and aggressive personality was only a problem because of her race and gender has no basis on the record . . . [and] is not enough to show pretext.").

But, Carman argues, pretext can be found in the fact that other candidates were not similarly "vetted" for personal discord with existing employees of the Prosecutor's Office. However, this Court finds no racially discriminatory animus in Goodrum expressing her discomfort working with Carman

8

and no pretext in Defendants taking Goodrum at her word. Further, no requirement exists that employers seek out opinions on all candidates from its existing employees.

Nor has Carman undermined Defendants' other stated reason for not hiring Carman -- that Almaro was the overall better candidate. Almaro had seven years experience as an assistant prosecutor in one of Ohio's largest counties. She also had experience representing a county in family drug court.

Carman argues this Court should not compare her to Almaro, the successful candidate; rather, Carman should be compared to candidates who received an interview and a pre-interview questionnaire. During oral argument, counsel cited *Kline v. Tenn. Valley* Auth., 128 F.3d 337, 351 (6th Cir. 1997), in support of the proposition that a failure-to-hire plaintiff should be measured against candidates receiving interviews, not solely the successful candidate. Specifically, Carman directs this Court to a passage in that case stating that the "lack of an interview for Kline is another basis for a finding of pretext and the district court mistakenly discounted this evidence." *Id.* However, this passage is narrowly limited to the particular facts of that case.

In that case, the TVA's own Equal Opportunity ("EO") Office determined that Kline had suffered racial discrimination when his resume and application were *never reviewed or considered* for a vacant personnel officer position because, unbeknownst to Kline, the human resources manager had already prepared a list of candidates for the position before Kline even submitted his application. The EO Office imposed a "re-selection order." *Id.* at 340. That order required the TVA to take corrective action by placing Kline in the position with back pay, if, after comparison, he was determined to be better qualified than the successful candidate, a white female. The TVA, without interviewing Kline, again selected the white female. *Id.* at 351. The white female had received an

9

interview during the initial selection process (whereas Kline had not even been considered), and the TVA cited the white female's interview performance as a determining factor to her initial hiring and subsequent re-selection.

It was this failure to interview Kline -- an opportunity afforded his opponent -- which gave rise to pretext. Procedurally, this case is a far cry from *Kline*. Carman's failure to secure an interview did not occur within the context of a re-selection process where the hiring committee was working under a mandated order to specifically consider the relative qualification of two candidates -- one of whom had been interviewed, the other not. This Court further notes that Kline was ultimately being compared to the successful candidate, not the entire pool of individuals who received interviews during the initial selection process. For this reason, Defendants' failure to interview Carman for this position (or the other three positions discussed below) does not give rise to an inference of pretext.

### 2011 Assistant Prosecutor

Carman cannot establish the fourth element of a prima facie case. Because Defendants ultimately chose not to fill this position, Carman must offer additional direct, circumstantial, or statistical evidence indicating that Defendants *singled out* Carman for non-hire. *See Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1464–65 (6th Cir. 1990) (discussing standard for reduction-in-force scenarios). Carman has offered no such evidence.

Even if Carman could make out a prima facie case, she fails to establish that the proffered reasons provided by Defendants (budget concerns, Carman's battle with Goodrum, and a lack of experience in criminal law) did not actually motivate the decision not to fill the position. And, as stated above, the failure to secure an interview is not pretext.

April 2011 DJFS Director

Carman cannot make out a prima facie case for this position -- she fails on both the third element (that she was qualified) and on the fourth element (that she was similarly situated to Voltz, the successful candidate).

The minimum qualifications for the April 2011 job posting included a bachelor's degree in social work, counseling, or a related field and at least seven years progressively responsible experience in supervision in at least one division.  A master's degree and fifteen years' progressive experience were preferred.  Carman's bachelor's degree was in music.  Her employment with the DJFS in Huron County and Sandusky County totaled slightly over four years.  In addition, Carman had never served as a director, interim director, administrator or top supervisor of any of the four divisions in Huron or Sandusky Counties.  She had no experience working in three of the four DJFS divisions.

Voltz, on the other hand, had been in a supervisory position with Erie County DJFS since 2004, progressing from assistant program administrator, to interim program administrator, to administrator of the social services division, and finally, to assistant director of DJFS.  Carman is not similarly situated.  Simply put, she lacked the experience and background for this high-level management position.

December 2011 DJFS Director

The record evidence again establishes Carman was not qualified to be DJFS director, rendering her unable to make out a prima facie case. For the same reasons Carman failed to meet the minimum qualifications in her April 2011 application, she again failed to meet the minimum qualifications in her December 2011 applications.

Further, she is not similarly situated to Karen Balconi-Ghezzi, the successful applicant. Balconi-Ghezzi had been serving as interim-director for a number of months. Prior to that, she had worked for DJFS for nearly nineteen years, including nine years as the administrator of one of the four divisions.

Statistics of Minority Employees

In her Opposition Brief, Carman points to statistics of the racial composition of Defendants' employees as evidence of discrimination (*see* Doc. 66 at 8, 29) (alleging that while Erie County is "made up of approximately 12.2% African American individuals," Defendants only employ 4.5% Africans Americans in their "top paid positions"). However, this statistic is not relevant in evaluating Carman's discrimination claims. For statistics to serve as evidence of discriminatory hiring practices, the Sixth Circuit requires a comparison of "the racial composition of the pool of qualified [assistant prosecutor / DJFS director] candidates in the [Erie County] market." *Hopkins v. Canton City Bd. of Educ.*, 477 F. App'x 349, 358 (6th Cir. 2012). Carman's comparison falls short, failing to meaningfully identify the racial composition of the pool of qualified candidates.

**Counts I and III - Retaliation (Failure to Hire after OCRC Complaint)**

Retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework. To establish a prima facie case of retaliation, a plaintiff must show: (1) she engaged in a protected activity; (2) defendant knew of the protected conduct; (3) defendant thereafter took an adverse employment action; and (4) a causal connection between the adverse employment action and the protected activity. *Colston v. Cleveland Pub. Library*, 522 F. App'x 332 (6th Cir. 2013).

Carman has not put forward sufficient evidence of a causal connection, other than temporal proximity. In this case, that alone is insufficient. Defendants rejected Carman for the exact same

position (DJFS director) five months *before* Carman filed an OCRC charge, and again rejected her three months after she filed the charge for the *same* reason; namely, that she was unqualified for the director position.

Even if Carman could establish a prima facie case, she has not put forward evidence that Defendants' stated rationale (that she was unqualified or at least less qualified than the successful candidate) was mere pretext. Balconi-Ghezzi had a great deal more experience than Carman, having worked for DJFS for nearly nineteen years, with half that time spent as the head administrator of one of the four divisions.

### Count IV - Section 1981 Employment Contract

Section 1981 "provides a federal remedy against discrimination in private employment on the basis of race." *Tackett v. Marion County Fair Bd.*, 272 F. Supp. 2d 686, 691 (N.D. Ohio 2003) (internal citation and quotation marks omitted). Having found Carman's race discrimination claims without merit, this Court must also dismiss Carman's Section 1981 claim. *See Young v. Sabbatine*, 2000 WL 1888642, at *4 (6th Cir. 2000) ("[A] failure to make a *prima facie* case under Title VII precludes a finding under § 1981."); *see also generally Haughton v. Orchid Automation*, 206 F. App'x 524 (6th Cir. 2006) (analyzing plaintiff's Title VII and Section 1981 discrimination claims together, under the same standard).

### CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (Doc. 53) is granted and this case is dismissed.

IT IS SO ORDERED.

                                                s/ *Jack Zouhary*
                                                JACK ZOUHARY
                                                U. S. DISTRICT JUDGE

                                                September 16, 2014